UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CASE NO. 04CR10025GAO |
| | ) |
| SCOTT BOIDI | ) |

———————————————————

**DEFENDANT'S MOTION FOR DOWNWARD DEPARTURE AND/OR VARIANCE
FROM THE SENTENCING GUIDELINES AND INCORPORATED
SENTENCING MEMORANDUM**

NOW COMES the Defendant, Scott Boidi, through counsel, and hereby moves this

Honorable Court for a downward departure from the otherwise applicable guideline range both

as recommended by the Probation Department and/or from the Defendant's final Guideline

Sentence as determined by the Court.[1]  In support thereof, counsel states the following:

1.    **Safety Valve**

The Presentence Report, ("PSR"), dismisses the Defendant's qualifications for the

"safety valve" as set forth in 18 U.S.C. § 3553(f) and U.S.S.G.§§ 2D1.1(b)(6) and 5C1.2 on the

basis of acquitted conduct involving the possession of a firearm.  Notwithstanding the PSR's

recommendation to the contrary, the Defendant satisfies the "safety valve" criteria both factually

and legally and hereby moves this Court for a sentence that is both beneath the statutory

mandatory minimum sentence of five years and that considers an advisory Guideline Calculation

which includes, but is not limited to a two level downward adjustment.  Additionally, the

_____

[1] It is not clear to the undersigned counsel, in light of *Booker v. United States*, 543 U.S. 220  (2005), whether a
formal Motion for Downward Departure is still required given the advisory status of the Guidelines.  However, in an
abundance of caution and for the purpose of notifying the Government of intended sentencing arguments, I am filing
the instant motion on behalf of Mr. Boidi.  Assuming the Court does not agree that the proposed departures should
be awarded to the Defendant under the Sentencing Guidelines, the Court is respectfully urged to consider them in
imposing sentence under 18 U.S.C. § 3553.

Defendant objects to any advisory two level increase for possession of a firearm under §2D1.1(b)(1) for the same reasons argued herein.

It is undisputed that the Defendant was the licensed owner of several firearms during the offenses. He was also licensed to carry a firearm in the Commonwealth of Massachusetts which was stipulated to at trial. It was further stipulated that on or about January 28, 2001, the Defendant purchased a new firearm. This occurred after he had his life threatened on January 26, by Morgan Curran, an incident which was reported to the FBI. (See Exhibit 1, attached hereto). In defending the § 924c charge in the Superceding Indictment, the defense took the position that the Defendant carried the firearm at all times because of his fear of Morgan Curran, not in connection with the drug distribution charges. Several Government witnesses at trial including Dominic Mazzeo confirmed both the Curran incident and the Defendant's fear of Curran. Mazzeo testified that he was present during the argument in an adjacent office, heard Curran say that he was going to cut someone's head off and that the Defendant was visibly scared afterwards.

In finding the Defendant not guilty of the 924c charge the jury obviously believed the defense theory because it was given no alternative theory by the Government. Indeed, there was no credible evidence at trial that the Defendant ever did anything more than carry a firearm when he went to purchase small quantities of drugs. The mere fact that he lawfully carried a firearm is not sufficient to establish a connection to the drug distribution offense. *United States v. Nelson*, 222 F.3d 545 (9th Cir. 2000)(defendant need only prove by a preponderance of evidence that the weapon was not possessed in connection with the offense and not that it is clearly improbable that it was not.)

Essentially, the jury found that a reasonable doubt existed as to whether Mr. Boidi carried a firearm in connection with a drug related offense. Mr. Boidi never took the position at

trial that he did not carry a handgun.  On the contrary, the evidence at trial was that Boidi was

licensed to carry a firearm in the Commonwealth of Massachusetts and began carrying a firearm

shortly after he had his life threatened by Morgan Curran on or about January 26, 2007.  (See

Exhibit 1, attached hereto).  Although the jury heard from Government witnesses that the

Defendant carried a firearm during drug transactions there was no evidence that it ever

facilitated the transaction in any way.  At best, the Government's witnesses described an incident

in which Mr. Boidi allegedly showed one of them the handle of the gun after suspecting that the

drug dealer had been romantically involved with Boidi's girlfriend.  This did not in any way

facilitate the transaction.  In fact, if it had really occurred it is likely that it might have prevented

further transactions from occurring.  Based upon the FBI 302 and the testimony of the witnesses

at trial the Defendant has satisfied his burden of proof that the weapon was not possessed in

connection with the drug conviction.

### 2.        Personal Use and Lack of Drug Sales

Mr. Boidi's  role in this offense does not justify the "high end" sentence recommended

by the Probation Department.  Mr. Boidi is not alleged to have sold any drugs or profited in any

way from his drug related crimes.  In fact, a substantial portion of the drugs were used by him

personally.  In *United States v. Lara*, 47 F.3d 60, 66-67 (2nd Cir. 1995), the United States Court

of Appeals for the Second Circuit recognized a departure where the defendant's role in a drug

conspiracy was not adequately considered by the Sentencing Commission despite existing

adjustments where the quantity of drugs substantially exceed the defendant's role.

Additionally, although the First Circuit has held that personal use quantities may be use

included in relevant conduct, *United States v. Innamorati*, 996 F.2d 456 (1st Cir. 1993), it has not

considered this issue in the context of a case like the instant case in which the Government has

agreed that the Defendant did not sell any drugs at all.  Other circuits have concluded that

3

personal use amounts should be deducted from relevant conduct. *United States v. Williams*, 247 F.2d 353 (2ⁿᵈ Cir. 2001); *United States v. Gonzales*, 307 F.3d 906 (9ᵗʰ Cir. 2002); *United States v. Asch*, 207 F.3d 1238 (10ᵗʰ Cir. 2000). Because the Defendant did not seek to profit from his conduct in giving drugs to friends and personally using them he should not receive the same sentence under the Guidelines or § 3553 as defendants who sold similar quantities of drugs for profit.

### 3.    Extraordinary Post-Offense Rehabilitation

A defendant's post-offense rehabilitation may be the basis for downward departure if it is "extraordinary" and "exceed[s] ordinary expectations." *United States v. Sklar*, 920 F.2d 107, 116 (1st Cir. 1990). This departure has also been described as "hen's-teeth rare." *United States v. Craven*, 239 F.3d 91, 99 (1st Cir. 2001). "The touchstone of extraordinary rehabilitation is a fundamental change in attitude." *United States v. Craven*, 239 F.3d 91, 100 (1st Cir. 2001). The defendant must demonstrate a "real, positive behavioral change . . . and a commitment to repair and rebuild his or her life." *United States v. Motto*, 2002 WL 1018575, at *2 (E.D. Pa. May 17, 2002) (internal quotation marks omitted).

In considering a downward departure for extraordinary rehabilitation, the sentencing judge might consider "all of the pertinent circumstances, including the nature of the defendant's addiction, the characteristics of the program []he has entered, the progress []he is making, the objective indications of [his] determination to rehabilitate [him]self, and [his] therapist's assessment of [his] progress toward rehabilitation." *United States v. Maier*, 975 F.2d 944, 948-49 (2d Cir. 1992). A defendant can rebuild his

or her life and demonstrate extraordinary rehabilitation by remaining drug-free for a two-year period and renewing relationships with family members.  *See United States v. Hernandez*, 2001 WL 96369 (S.D.N.Y. Feb. 2, 2001).  The court may also consider that the defendant continued substance abuse treatment that was not required by Pretrial Services, remained drug-free, cared for family members and demonstrated hard work and diligence in his employment.  *See United States v. Wilkes*, 130 F. Supp. 2d 222, 228-29 (D. Mass. 2001).

As a condition of his release on bond, Pretrial Services ordered Boidi. to refrain from drug use.  Boidi complied with these orders.  However, Boidi had already satisfied the criteria for extraordinary post-offense rehabilitation began prior to his indictment on the instant charges.  Boidi voluntarily enrolled himself in an inpatient rehabilitation program at Bournwood Hospital  in June of 2002.  PSR, p 32; (See Exhibit 3, attached hereto.)

Boidi's rehabilitation is also extraordinary because he has remained drug-free since his release from Bournwood.  According to the PSR Boidi began using drugs at a young age and progressed to daily destructive cocaine addiction by 2001.  In spite of this powerful addiction, he has not tested positive since his release and has demonstrated his determination to rebuild his life.

**4.    A Departure is Warranted Based Upon the Victim's Conduct**

Although not a factor in the Defendant's advisory Guideline Sentence the amount of the alleged embezzlement should be offset by the negligence of Local 88 and LIUNA in failing to address the Defendant's substance abuse problem in the Fall of 2001, before the alleged

embezzlement of the cash in 2002. Specifically, on September 13, 2001, October 31, 2001 and

November 13, 2001, the Defendant's wife, Elaine Boidi, wrote to senior management at LIUNA

asking for assistance in getting the Defendant substance abuse treatment. No action was ever

taken by the Union despite Mrs. Boidi's pleas for help. This situation is similar to cases

involving multiple causation for the victim's loss. *United States v. Gregorio,* 956 F.2d 341 (1st

Cir. 1992); *United States v. Rostoff*, 53 F.3d 398 (1st Cir. 1995). Here, not only did another

Government witnesses testify that he took cash from the same source that Boidi was convicted

of, but senior management at LIUNA had direct knowledge of the Defendant's substance abuse

problem long before the embezzlement of the cash and took no steps to prevent it from occuring.

Equally compelling is Mrs. Boidi's attempt to get substance abuse treatment to help her

husband. Had the Union taken the appropriate action in October of 2001, the Defendant's

substance abuse would not have spiraled out of control resulting in a jury verdict that he

possessed with intent to distribute more than 500 grams of cocaine. The Court should consider

the negligence of the Union in departing downward from the Sentencing Guidelines or

sentencing Boidi pursuant to § 3553.

### 5.    Loss Calculations

It is submitted that pursuant to the testimony of Dominic Mazzeo and all logical

inferences to be drawn from the scope of the Defendant's employment that the following

expenses relating to Count 2 are unrelated to the Defendant's employment and therefore, the

Defendant should not have been reimbursed for them:

| | |
|---|---|
| Lane Bryant | $81.98 |
| Nine West | $41.99 |
| Victoria's Secret | $38.00 |
| Cache | $148.00 |
| South Shore Plaza | $75.00 |
| Sam Goody | $40.93 |
| Sun Glass Hut | $42.00 |

|                          |            |
|--------------------------|------------|
| Macy's                   | $165.50    |
| Macy's                   | $49.35     |
| Travel expenses for trip | $181.45    |
| to Lincoln, NH           | $36.00     |
|                          | $214.41    |
|                          | $96.12     |
|                          | $96.12     |
| Subtotal:                | $1,306.85  |

When this subtotal from Count 2 is combined with the $7,500 and $1,802.56 from Counts 3 and 4 it results in a net loss of $10,609.93.  However, from this loss the PSR agrees that a figure of $10,657.93 is refunded by the Defendant before criminal charges are ever initiated. Therefore, there is no real or intended loss in this case.

6.    Mr. Boidi's conviction constitutes "aberrant behavior" entitling him to a departure from the applicable sentencing guidelines.  *United States v. Pozzy*, 902 F.2d 133, 137-138 (1st Cir. 1990); citing *United States v. Russell*, 870 F.2d 18 (1st Cir. 1989).

7.    A combination of the above factors may constitute a separate basis for departure. *Koon v. United States*, 518 U.S. 81, 113-14 (1996); *United States v. Sklar*, 920 F.2d 107, 117 (1st Cir. 1990).

WHEREFORE, based upon the foregoing arguments and authorities, this Honorable Court is respectfully urged to depart downward from any sentence determined under the Sentencing Guidelines.

Respectfully submitted,

Peter Charles Horstmann, Esquire
BBO #556377
PARTRIDGE, ANKNER & HORSTMANN, LLP
200 Berkeley Street, 16th Floor
Boston, Massachusetts 02116
(617) 859-9999

### CERTIFICATE OF SERVICE

I, Peter Charles Horstmann, Esquire, hereby certify that on this 16thth day of February, 2006, a copy of the foregoing motion was served electronically, upon Laura Kaplan, Assistant United States Attorney, United States Attorneys Office, One Courthouse Way, Boston, MA 02210

Peter Charles Horstmann, Esquire

# EXHIBIT 1

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    1/29/01

    SCOTT R. BOIDI, Business Agent for Local 88 of the Laborers Union, was interviewed at the Weymouth Police Department. After being advised of the official identity of the interviewing Agents and that the interview concerned the arrest of MORGAN CURRAN, BOIDI provided the following information:

    Over the last several years BOIDI has had to deal with numerous threats of violence, some directed at him, which he believes are related to an attempt by a number of individuals to force him out of his position in the Union and replace him with BARRY O'BRIEN. O'BRIEN is the President of Local 88 but this is a position with virtually no authority. The individuals behind O'BRIEN are mostly from the South Boston and Charlestown areas of Boston. BOIDI stated that he has gradually learned that many of them have serious criminal records.

    BOIDI brought one of them, JAMES ARMSTRONG, into the Union at the request of O'BRIEN. Eventually ARMSTRONG asked BOIDI to bring ARTHUR BURGESS and JOHN FIDLER, JR. into the union. BOIDI identified them as the principal members of the group trying to seize control of the Union. Until recently they were on good terms with MORGAN CURRAN, a Union member but that apparently is no longer true.

    During the prior week CURRAN, who held a management position with MODERN CONTINENTAL at the Weymouth, Massachusetts job site, had indicated that he wanted to put a former Local 88 member, MICHAEL FLAHERTY, on the job. BOIDI recalled that about one month ago he had received an anonymous phone call telling him not to stand too close to FLAHERTY because he might get shot by mistake. EDWARD SYLVA called BOIDI and told him that FLAHERTY was at the Weymouth site. BOIDI told SYLVA to let CURRAN hire FLAHERTY. He then heard that BURGESS and ARMSTRONG wanted to kill FLAHERTY. He contacted them by phone through SYLVA. They said they did not want to kill FLAHERTY but they thought he was a source for the FBI. BOIDI said that he knew ARMSTRONG and BURGESS were very upset with CURRAN for hiring FLAHERTY.

    As a result of the tension at Weymouth BOIDI replaced the steward, BRIAN BAITONI with SYLVA because he felt SYLVA was better able to keep control of the dangerous members such as

---

Investigation on    1/27/01    at  Weymouth, Massachusett

File #  46E-BS-84900 Sub 302                                    Date dictated    1/29/01

      SA James J. Lavin, III
by    SA William J. White, Jr.

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

46E-BS-84900 Sub 302

Continuation of FD-302 of ___SCOTT R. BOIDI_____ , On __1/27/01_____ , Page ___2___

BURGESS and ARMSTRONG. On approximately 1/25/01, BOIDI was told by an individual he did not want to identify that MORGAN CURRAN had put a gun to FLAHERTY'S head and had him strip to see if he was wearing a recording device. Tension at the Weymouth job site was so bad that a long time member, JIMMY MAYS quit work because of his fear and rumors that expolsives were being stolen.

The next day at 11:30 AM CURRAN entered BOIDI'S office and waved a gun around. BOIDI believed it to be a .50 caliber handgun. CURRAN told BOIDI that he was going to kill SYLVA because he, CURRAN, would be in charge. He said he was going to dig up CHARLES SYLVA and cut off his head. He stated that he would take over the union with his IRA associates and he told BOIDI to place three more unnamed IRA members at the Weymouth job site. After CURRAN left, BOIDI took the rest of the day off. He consulted with his attorney and a friend and then contacted the Weymouth Police Department.

# EXHIBIT 2

Sept 13,01

Dear Paul,

I am writing to you to follow up our phone conversation back in August. My children and I have been devastated by what is happening with my husband. He is not well and in desperate need of help.

As you know, he really is a kind and decent person. He means the world to me and my children and I can't bear to think that something cannot be done to help him. He has been a wonderful and caring father, and a great husband to me and the kids and I miss him terribly. The kids seem frightened and unsure of the world around them in light of the events on Tuesday. Ronnie especially misses him at his football games, and his helping him with his fort. He seems to be showing some signs of anxiety and I fear that with school just underway things may get worse.

As for the local he has always been a strong and constant advocate for his members. He has worked tirelessly at building the local up from what it was ten years ago to what it is today. I can't imagine anyone who has worked harder on that level than he has. You do not know how many times I had to tell him to slow down and take a deep breath. He is very passionate about the Union, and he could never in his wildest dreams picture himself doing anything else. Next to the kids and I the local union is the most important thing in the world to him.

However, as you have stated, you know that the stress of the job can be overwhelming and sometimes take quite a toll on people. I believe in this case, it has. I appreciated very much your sharing your personal story with me. I was very encouraged by it. You said you were aware of this situation, and I was relieved that you promised to help. I know you are a very busy man, but I believe something must be done to help him soon. I am wondering what you might have in mind. Please let me know what you've been able to do since we last spoke. I have not heard from my husband in a couple of weeks and I am very concerned.

Very Truly Yours

*Elaine Borde*

Elaine R. Boidi
32 Water Street
Pembroke, MA 02359
October 31, 2001

Mr. Armand Sabitoni
General Secretary-Treasurer
& N.E. Regional Manager
226 South Main Street
Providence, RI 02903

Dear Mr. Sabitoni,

     Enclosed is a copy of a letter I sent to Mr. Paul McNally regarding my husband, to which I've received no response. As I have already stated in that letter, my children and I have been devastated by what is happening with Scott. He has stated to me that filing for a divorce was his way of getting people to stay out of his business. This shifted the focus of his substance abuse problem to a "marital problem."

     I implore you to try and intervene on my family's behalf. Scott has a substance abuse problem, which I believe was brought on by the anxiety and stress of the job. He has always been a very loving husband and father and I am very concerned about him. I love my husband very much and only want him to receive treatment for his addiction. He has not been allowed any unsupervised visitation with our children because he refuses to take a more accurate drug test than a urine screen, that I know can be adulterated. Even now his visitation with our children is erratic at best. He does not call them and sees them every two to three weeks. This is not the man I've known for seventeen years.

     I have tried everything I can think of to try and reach him, but his denial is very strong. When I told him he would have to leave our home if he didn't get help, I was stunned that he left. I realized then how much of a grip the drugs had on him. His behavior worsened and so did the drug and alcohol abuse.

     Other people have been seen driving the union vehicle while he is not in it. This could be a liability if they were to get into an accident. At the September Union meeting I met Scott shortly before it started, and he had a suit with a white undershirt on. I asked him where his shirt was and he said he forgot it. Also, I'm sure by now you have had a chance to see the History Channels tape on the Sandhogs. Scott was obviously under the influence in

that video, which was filmed in December 2000. He has become the topic of gossip of many of the labor unions. There are many more examples of his lack of judgement and irresponsibility. I am not interested in hurting his reputation, I am more concerned with getting him into a treatment program as soon as possible, before things get any worse. I am worried that he will wind up in serious trouble or dead of a heart attack.

He has periods where he can pull himself together and get things done and from everything I have read this is not unusual. However, he has missed an enormous amount of time at work and coworkers are enabling him to continue in this pattern. You have an invaluable members assistance program in place, and my children and I are taking advantage of the help they offer for families in crisis.

I am begging you to help my husband. This is a disease for which treatment is available through the Members Assistance Program. I believe my husband I still a wonderful person, husband, and father in spite of his problem. I understand that his behavior is more a symptom of his illness. I know Scott has great respect for you as the General Secretary-Treasurer and Regional Manager. There must be something that the Laborers as a family can do to intervene. I have three beautiful children who need their father in their lives clean and sober.

Please understand that this letter, in no way, is meant to undermine Scott and the many good things he's accomplished. I am very proud of him. I am only trying to get him to get the help he needs for his substance abuse problem. I feel, in your capacity in the Laborers Organization, that you could have a tremendous impact on Scott. Please help me to help him. I would greatly appreciate your assistance in this situation and look forward to hearing from you as soon as possible.

Sincerely,



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr Armand Sabitoni
General Secretary-Treasurer
Regional Manager
224 South Main St.
Providence RI. 02903

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)   B. Date of Delivery

C. Signature
X _Joseph Niederer_   ☐ Agent  ☐ Addressee

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
   ☐ Certified Mail   ☐ Express Mail
   ☐ Registered       ☐ Return Receipt for Merchandise
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)    7001 1940 0002 9101 2090

PS Form 3811, March 2001    Domestic Return Receipt    102595-01-M-1424

---

Postal Service
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

| OFFICIAL USE |
|---|

| | | |
|---|---|---|
| Postage | $ ✓ | |
| Certified Fee | ✓ | Postmark Here |
| Return Receipt Fee (Endorsement Required) | ✓ | |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ 3.94 | |

Sent To  Mr Armand Sabitoni
Street, Apt. No.; or PO Box No.  224 South Main Street
City, State, ZIP+4  Providence RI 02903

Form 3800, January 2004    See Reverse for Instructions

Mr. Armand Sabitoni
General Secretary-Treasurer
& N.E. Regional Manager
226 South Main St.
Providence, RI. 02903

Elaine R. Boidi
32 Water St.
Pembroke, MA. 02359

November 13, 2001

Dear Mr. Sabitoni,

I am saddened and disappointed to think my pleas to help Scott are falling on deaf ears. Especially since he was arrested last week. That should have been a shock and a wake up call to everyone. His behavior is out of control. I am frightened for him and our children as well as myself. Please do not stand by while he self-destructs. He needs to be in a treatment program immediately.

That situation could have easily escalated into something much more serious. I am not sure if you are aware that Scott has a license to carry a firearm, and does own a gun. This is why I am concerned. You must realize that this could be a volatile situation. I believe he is screaming out for help.

Since I have not received a response from you or Mr. McNally, I don't know if you have taken any action. However it does not appear that you have done anything. I cannot understand your reluctance to step in. I believe Scott has had or is having some type of breakdown and someone with authority needs to intervene. That is why I have written to both you and Mr. McNally. I know it isn't an easy thing to do but something must be done immediately. I know other people concerned about Scott have been in contact with you and Mr. McNally about this situation. I believe they do not know what the appropriate action is to take, and are looking to you for guidance. Scott has always been there to help the members of Local 88. It is time for someone to be there for him.

Sincerely,



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr Armand Sabitoni
226 South Main St
Providence R.I.
02903

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly) | B. Date of Delivery 11/31

C. Signature
X ____ □ Agent / □ Addressee

D. Is delivery address different from item 1? □ Yes
If YES, enter delivery address below: □ No

3. Service Type
□ Certified Mail   □ Express Mail
☑ Registered   □ Return Receipt for Merchandise
□ Insured Mail   □ C.O.D.

4. Restricted Delivery? (Extra Fee)   □ Yes

2. Article Number (Transfer from service label)   7001 0320 0002 8170 7338

PS Form 3811, March 2001    Domestic Return Receipt    102595-01-M-1424

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

OFFICIAL USE

| | |
|---|---|
| Postage | $ 3¢ |
| Certified Fee | 2.60 |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | 1.90 |
| Total Postage & Fees | $ 3.9¢ |

Sent To  Mr Armand Sabitoni
Street, Apt. No.; or PO Box No.  226 South Main St
City, State, ZIP+4  Providence RI 02903

7001 0320 0002 8170 7338

# EXHIBIT 3



*A continuum of psychiatric
and chemical dependency services*

June 26, 2002

To Whom It May Concern:

I am writing on behalf of Mr. Scott Boidi. Mr. Boidi was admitted voluntarily to the Dual-Diagnosis Adult Residential Treatment (DDART) program at this facility on June 5, 2002. While in the program, he has been compliant with all aspects of treatment. He actively participates in group therapy sessions and is eager to build a solid knowledge base with respect to his disease. Mr. Boidi has exhibited a hopeful, positive attitude with a focus on creating for himself a better, more productive future.

Discharge is planned for Friday, June 28, 2002. The treatment team strongly recommends that Mr. Boidi continue his treatment on an outpatient basis, with day treatment, individual therapy, medication management, and family therapy. Attending Alcoholics Anonymous and/or Narcotics Anonymous is a requisite part of Mr. Boidi's ongoing treatment plan. Mr. Boidi has expressed the desire to move forward with his life and is extremely receptive to the recommendations outlined by the treatment team.

If I can be of any further assistance, feel free to contact me at: (617) 676-3370.

Respectfully,

Cindy Gatto, RN,C.MS,NP
Clinical Director of Ambulatory Services

300 South Street • Brookline, Massachusetts 02467 • 617 / 469-0300 • fax 617 / 469-5023

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | )  CASE NO. 04CR10025GAO |
| v. | ) |
| | ) |
| SCOTT BOIDI | ) |
| | ) |

## STIPULATION REGARDING DEFENDANT'S
## IN-PATIENT TREATMENT AT BOURNEWOOD

The Parties hereby stipulate and agree that Scott Boidi received in-patient substance abuse treatment at Bournewood Hospital from June 5, 2002 to June 28, 2002. He received treatment on an out-patient basis following his discharge on June 28, 2002.

Peter Charles Horstmann, Esquire
BBO # 556377
PARTRIDGE, ANKNER & HORSTMANN
200 Berkeley Street, 16th Floor
Boston, MA 02116
(617) 859-9999

Laura Kaplan, Assistant U.S. Attorney
BBO #
Office of the U.S. Attorney
1 Courthouse Way, Suite 900
Boston, MA 02110
(617) 748-2023